It's right in the middle, right in the middle. Thank you, Your Honor. May it please the Court, Peter Stris for the Plaintiff Appellant. I'd like to begin with the question of fiduciary status. Under ERISA, a person is a fiduciary with respect to a plan when, quote, he exercises any control respecting management of its assets. In this case, no one disputes— What did you just cite to? Pardon me, Your Honor? What did you just cite to? You quoted, but what's the cite to? Yeah, so that's 29 U.S.C. 1002, subsection 21A, and we quote it on page 17 of our opening brief, and it's identified in the statement of case for both sides as the core provision at page 4 of our brief and at page 3 of the principal's brief. In this case, no one disputes that the contract at issue is a plan asset, so our core position is that when principal chooses an interest rate every six months pursuant to the contract, principal is surely exercising some control respecting its management. Principal has two responses. First, principal argues that ERISA plans have final say over whether to accept the proposed rate, but that argument is foreclosed by the undisputed facts in this case. It's undisputed, and you can look at the contract itself. It's at page 44 of the appendix, that if a plan doesn't like the interest rate proposed by principal, it's stuck with it for 12 months unless it pays a mandatory 5 percent surrender penalty. Okay. Within the 12-month period, can there be a six-month change in the rate by a principal? So Judge Benton, my understanding is that principal announces every six months, here's the rate. If you're the plan— When does the rate take effect? The rate takes effect some number of days thereafter. A matter of days, not a matter of six months later. No, a matter of days, correct. I don't remember if it's seven days, 20 days, a matter of days. And if the plan says we don't like it, they're locked in for 12 months at that rate unless they pay 5 percent. Okay, but then every six months the rate's being changed. During that 12-month period, can they change the rate again? Principal can announce a new rate during that 12-month period for sure, but even after notice is given, they can change the rate in the middle. But my understanding is it won't have affected that plan because that plan will have exited at that point. That plan will have said we're exiting, but we're stuck for 12 months. It's an exit from the product. So the new interest rate in six months doesn't apply if they've invoked the 12-year get-out provision? The new provision every six months will apply as long as the plan isn't exiting. If the plan is exiting, then it basically is stuck with the rate that was announced for 12 months. Actually, I don't know if it gets changed again. Well, that's very important to me, and I sure couldn't tell from any of the briefs in this case, all of them. I think you probably... That very simple little question of if you give the exit 12 months, can they change it in the middle of the time? I think you probably won't find that answer in the record, because from our perspective, if the answer is yes, that makes it worse. In other words, even on... Counsel, suppose to me that's the most important issue in the case, and suppose I don't agree with everything else. Is there any... There's nothing in the record to tell us? I mean, the contract itself is in the record at pages 72 to 103 of the appendix. I don't... I don't have any sort of deposition testimony or extrinsic evidence, but the contract itself, I guess, could be interpreted on that point. That's the price of all the services in this thing, and it's not in the record. Well... And it's basic accounting and basic periods. I don't get it. I mean, I suppose my friend from principle, you could ask him, and he may tell you and know better than I, but from the perspective of... And I appreciate that you may believe that's the most important fact in the case, but what I would say is, whatever you think the bad answer to that is for us, it shouldn't impact the determination on fiduciary status, because any restriction essentially would kill a planned fiduciary status defense, and I want to be clear on this. Every successful final defense case in district courts, circuit courts, you can survey this and look... Everyone throughout history has involved a situation where there was no enforced restriction of any kind, and I would encourage you to look at the cases cited by the district court that accepted a final say defense. There are only three. They're at page 42 to 43 of the appendix, Hecker, Zhang, and Nsingha. No restriction in any of them. But McCaffrey says if you're following an agreed-upon, arm's-length deal, if you're following an agreed-upon deal, then it's okay. Suppose this had a formula based on some Federal Reserve secret meeting percentages, et cetera, et cetera. Principal would not be a fiduciary. We would not dispute that, and the reason why I think that is critical is, in McCaffrey, we are talking about a defined, fixed management fee and operating expenses, and in fact, if you look at page 1004 of that opinion, which I know you're quite familiar with, the court says, well, even if the contract did give principal the discretion to change fees, the plaintiff did, quote, not allege that principal exercised this authority. So the issue in this case wasn't reached in McCaffrey. McCaffrey is no different than all of the other cases that principal cites, Shulist at page 17, Santameno at page 17 of their brief, Seaway Foods at page 19, Renfro at page 19, they're all fixed. They involve fixed premium rates, a fixed formula for fees, fixed administrative fees, a fixed expense ratio. We don't dispute that if, at arm's length, a third party negotiates a fixed fee, that when they implement that, they're not a fiduciary. That can be a variable fee, too, counsel. When I say fixed, that's a good point. I mean fixed as in there's no discretion. It's a normal accounting term or a normal fiduciary term. Go ahead. That's correct. So that's our core position on principal's first response, which is what I'm going to call plan final say. And I think it's quite clear that there was error on the part of the district court on that issue. Now principal has a second argument. I think they would call it their first argument. They argue it most heavily, which is this notion of what I'm going to call participant final say. Now we think they're also wrong on the undisputed facts, which I'll get to in a minute. But more fundamentally, we think that their position is legally, the issue of participant's ability to remove their savings is legally irrelevant. And here's why. Fundamentally, in every self-directed retirement plan, and that's what this is, participants can choose to avoid any particular investment. But nobody would argue that the person who selected those investments or who selected the terms of those investments isn't a fiduciary. And that's precisely this case. To borrow the words of the Seventh Circuit in Ed Miniat, having control over the interest rate is, quote, not qualitatively different from the ability to select investments. This is no different than, and this happens a lot, if a plan hires a service provider to select what mutual funds are going to be in the menu of the plan. And the plan says, we want five mutual funds, we want them to have these attributes. We want a value fund, we want a growth fund, we want an international fund. But as long as you adhere to those attributes, you decide which funds go into the plan. No one, including my friend from principle, would say that the third party that is choosing the specific funds isn't a fiduciary. And fundamentally, as a matter of basic economics, choosing which funds you put in a plan is no different than choosing what interest rate is going to apply to a guaranteed product. There is no more core term to this contract than what the interest rate is. And so at the end of the day, this doesn't win the case for us. I want to be clear. This just means that there should be reversal and principle should be held to fiduciary standards so the case can then proceed to trial on what principle would concede is fundamentally a fact question, which is whether or not this is a reasonable contract under reasonable terms and their compensation is reasonable. Do you agree the law is properly stated in the Teats case? If I read all your briefs, I think all of you end up saying, well, Teats sets the law right. Yes. And just to be clear on what that means, this is at page 1213 of Teats, and it's a quote, when the plan or the plan participants cannot, I don't agree with the plan participants part, but when the plan cannot reject the service provider's action or terminate the contract without interference or penalty, the service provider is a functional fiduciary. We think it's quite clear here that principle is a functional fiduciary. There should be reversal, and we should be able to proceed on our first takeoff. So you think our circuit should adopt their two-part test? Well, if by two-part test, you mean from Teats, Your Honor? I think yes, with the caveat that the reference to plan participants, I think in the Tenth Circuit opinion, is wrong. I think that the Tenth Circuit was right that if you start with control, if you start with a two-part test, and then you go to final say, and you ask whether there can be a costless or a free exit, I think that two-part test is correct as long as the costless, the exit without impediment or penalty is applied to the plan, because that makes sense. When you're trying to figure out who is exercising control over the management of a contract, it's either the insurance company or it's the plan. It's certainly not participants. So I would say a modified, a slightly modified version. Teats look at the plan? Didn't that, didn't it analyze it from the perspective of the plan? It did. It ducked the question where I think the district court here got it wrong, but it has some language in the opinion referring to participants that I don't agree with. Teats also had a penalty-type provision, right? The Teats court found that that was waived in the case. In other words, there was a penalty provision. The Tenth Circuit held that that was not preserved. So the only issue before it was the 12-month waiting period. And then what the court held, and this is on page 12, 17, and 18 of its opinion, is that there was, quote, no evidence that Great West has ever imposed the waiting period on a plan's withdrawal. Your argument here, I assume, is that Teats, it is different because here they did seek to enforce it. Absolutely. Here, not only does the contract require it, that's at page 44 of the appendix, but if you look at page 249 of the appendix, which we cite on page 4 of the reply, principal conceded that the waiting period and the surrender charge cannot be waived. They're enforced in every case. So I wanted to reserve a little bit of my time for rebuttal. Thank you. Thank you, Mr. Stris. Mr. Hochman? Good morning, Your Honors. Rob Hochman for Principal Life. I'd like to start, actually, with emphasizing a fact that sort of went unnoticed in the argument. This is a case brought by participants on behalf of a class of participants. And my friend here got up and started talking about plan authority. And as he pointed out, our principal argument, our main argument, is that participant choice is decisive on the fiduciary duty claims. And we believe that's so for a very simple reason. Under the statute, the same provision of the statute that my colleague quoted, we are a fiduciary only to the extent that we exercise authority and control over plan assets. Participant choice matters here because participants have the power to choose whether their funds are ever assessed against the rate that we propose. We have no authority or control to impose any rate on them. Wait, wait, wait. If they give the 12-month notice, then can you change it at six months during that 12-month period? My understanding, and I don't think the record actually specifically, the contract actually specifically addresses this question, but my understanding about the way this works is we do adjust it every six months, and sometimes there's a change and sometimes there isn't. But we do adjust it every six months. The pool of assets that are subject to the fund, that new rate applies to all the pool of assets that are subject to the fund. So they're stuck and you can really work them over at six months. Participants are not stuck. Participants can leave. At any time. But then there's a penalty. But then there's a penalty. Not for participants, no. That's incorrect. It's only when the plan closes and tries to get all of the money out by the plan sponsor itself and says just force, remember this isn't participants choosing, that's the plan sponsor choosing. Participants can get their money out, no penalty, no surrender charge, no nothing. Unless 20 percent of them do it. Even there. That's the so-called stampede provision. 20 percent of them do it within a three-month period. That triggers just an inquiry. And it's not an inquiry into participant behavior. It's an inquiry into plan sponsor behavior. And that inquiry, by the way, does not undo any participant's transfer of funds. It does not assess a penalty against any participant's funds. And this is summary judgment, your honors. We've gone all the way through and there's no evidence, none, the stampede provision has never been triggered. That's really critical. Because just like in TEATS, the fact that there's a contract provision out there that may, under certain circumstances, lead to some action against a plan sponsor has no impact on participants' freedom, complete freedom and complete discretion, to withdraw their funds at any time. You heard Mr. Streis' argument, which made some sense to me, about how if you were involved in picking various funds, the international fund, et cetera, et cetera, you'd clearly be a fiduciary, independent of whether a participant put a penny in any of those. What's wrong with that? Yeah, so this goes to the other aspect of McCaffrey that I think is really critical. There's two aspects of McCaffrey that are controlling here, in my opinion, your honor. First, as we've been discussing and as discussed heavily in the briefs, is this question of final say. And participants always have final say and I'll get to plan sponsors even have final say, even though the surrender charge and the 12-month waiting period exists. We don't have final say. But the second part concerns the nexus, the relationship between the kind of fiduciary duty that's asserted and the claim that's asserted. And think about this, when you're talking about the menu being made available to investors, to participants, then sure, participant choice doesn't matter because participants can't exercise any choice about what's put on the menu and presented to them. They don't have the opportunity there. But they're the fiduciary. Of course they do. They can elect not to. No, no, no. I mean, at the point that the menu's being built, participants don't actually have anything to do with that. Okay. They only, after the menu's built, then they get to exercise their choice. But the fiduciary duty that applies at the menu building stage, your honors, is a duty only to present prudent investments. That's why they go to a Ponzi scheme as their example. They're saying if you breach the duty to present only prudent investment options to participants, they're trying to suggest that ruling for us and affirming the judgment here would throw that rule into doubt. But it won't. Because this claim is not a claim that the PFIO was ever imprudent. That's not the argument. So the lack of nexus from McCaffrey is really critical here. Instead... Well, wait, wait. McCaffrey says go by the contract, you're okay. This contract doesn't say anything at all, right, about setting this rate every six months? This contract absolutely says we're going to set the rate every six months and we're going to disclose it 30 days, not just a few days. We disclose it 30 days in advance. But it doesn't tell how it's set in any regard. Oh, that's true. It's left completely to your discretion. That's true. We... It does not disclose a formula and our mechanisms for doing that are subject to our discretion. That's true. But the point is... Why isn't that a nexus if a nexus ever existed? Because the outcome of that process is not alleged for any six-month period in the class period of this case to have presented the plan participants with an imprudent investment option. The argument is always the same. It should have been... It wasn't good enough for participants and that's why participant choice is so critical because the one thing we know participants are in a position to do, unlike presenting the menu, participants get to decide for themselves whether the offer we've made to them is good enough. That nexus is missing. But isn't that the next stage? Isn't that the question of whether it was a prudent offer? No. No. The question about whether... They have ever had any opportunity they wanted to allege that the PFIO as... At rates that we proposed was not a prudent investment option. They never did it. And there's a pretty good reason, as the record makes clear here. For the kind of safe investment that you get here, we were way ahead of a lot of other alternative investments in terms of the rate guarantee that we provided to participants. They didn't raise an imprudent investment option argument and they can't raise an imprudent investment option argument. Well, maybe then I... Let's assume that we hold that you're a fiduciary. What's the next step of the argument then? Well, the question then would be whether, in their theory, ultimately what they're interested in is the spread that we earned. They want to shrink it. They want to take some of that spread and give it to the participants. They want the participants to be given more funds than was promised to them, quite honestly. That the participants themselves said, we know how much you're going to give us. That's good enough for us. Their claim is that we breached the fiduciary duty by not making it better. That's it. It's not that it's imprudent. It's very, very important to understand that because that's what makes the Ponzi scheme a complete non sequitur. You don't have to touch those issues. You don't have to touch those cases at all. We are perfectly comfortable with them. We do not think any planned fiduciary who's building a menu has the right or can, without breaching fiduciary duties, present an imprudent investment option. The question about prudence of the PFIO is not before you because it has never been part of this case. Had it been part of this case, there would be a tremendous record establishing that that claim fails on its face. That's why they didn't bring it. So that's really critical. And when you understand that, you get to the point that that's why participant choice is so critical here. Because the only claim is who gets to evaluate whether the offer we made to them is good enough. And these are the final say cases simply. All of these cases we've cited from McCaffrey, the Santameno cases, Hecker, all across the country, everybody agrees that when a planned service provider doesn't have final say over imposing terms, changes in terms, on planned assets, it's not a fiduciary. What about the Seventh Circuit's case, Ed Miniat or whatever it is? So Ed Miniat, which was talked about, that's true. That was a case where change was made. But the participants and plans, neither of them had the option to withdraw, to get out. Nobody could reject it. It was a unilateral imposition. Every case they cite is the same in that respect. Every case they cite. Doesn't TEATS look at both the participants and the plan? Yep. At 1217, TEATS says, according to TEATS, that what matters is whether plan or participants can reject the offer. And again, that's all we're saying. If the plans or the participants can reject the offer, we're not a fiduciary. So in TEATS, could the participants reject the offer? Yep. Essentially in the same manner as in the Seventh Circuit. Then why did they look at whether the plan could and whether there was a penalty for the plan? You know, again, we think that they shouldn't have, but they went on to consider that. And I think, the way I understand the argument, is they're saying, well, it doesn't really You should look beyond the fact that participants control where their assets go, because the contract itself, the agreement, is, quote unquote, a plan asset, and we're adjusting a term. That's, as I understand it, their argument. And I'm happy to turn to why it is that the 12-month delay or the 12-month waiting period of surrender charge doesn't make us a fiduciary, because it doesn't actually give us final say. Doesn't it for 12 months? No. You set the rate within that 12-month period. Because they have the choice. Let's imagine this. Let's imagine this, Your Honor, an alternative way to structure this. We could have said, you know what, we have a way of estimating how much money is going to be in these kinds of funds. We could tell you, pay us up front. Pay us up front, and you can get out at the snap of a finger, whenever you want. But then there'd be no question, right? Or if you had a formula in there, there'd be no question. No, but there would be no question even without a formula, Your Honor. Okay, you better explain that one to me. Because even if we have discretion, they would be able to reject our offer. That's the same as an initial offer. It's no different. Whether we set the initial offer to a planned fiduciary by formula or by discretion, or we set a subsequent offer to the planned fiduciary by formula or by discretion, once the planned fiduciary has the right to say, no thank you, once anyone we're offering, plans or participants, can take their business elsewhere, then we're not a fiduciary. That's what all of the cases- After the 12-month period, you're not a fiduciary. Isn't that what you're saying? But during that 12-month period, you are. No, even doing, well, even, first of all, that kind of, that way of thinking about it turns ERISA fiduciary law sort of on its head, right? Because it's the planned sponsor that has the choice whether to wait 12 months or whether to pay the 5% surrender charge. If paying up front for the right to leave doesn't make us a fiduciary, they're better off under an agreement where we say, you know what, actually, you can pay us at the time that you want to leave. It's just the same. It's their choice, not our choice. There's no dispute about that. The question is whether they want to exercise that choice. And here's the rub. If we make them pay up front, they're in a much worse position than under this agreement. They don't know how much money is in the fund at the time they want to, they'll be predicting, they'll be guessing how much money might be in the fund when they want to exit. They don't know what the economic circumstances are going to be that might lead them to want to exit. They don't know what the demographics of their participant pool is going to be. All of these things that inform their choice about whether to pull the money out of the fund immediately or their choice to wait 12 months, all of that information is present to them under this arrangement. And the point is, as I keep emphasizing, it's their choice. It's not ours. And if they make the choice to wait 12 months, that's fine. There might be very good reasons to do that, because the participants have a lot of money in there, maybe they're people approaching retirement, maybe they're people who don't want to have their money yanked out of a very safe investment like this. But the point is, it can't be when they have the choice and the manner in which they choose to exercise their choice makes us a fiduciary. That turns the statute upside down. It's supposed to be our authority and control, not theirs. Now they want to say that the 5%s are under charge of some kind of penalty. It's just an agreed term of the contract. They've agreed. We have the choice and we could have paid up front, but we'll pay now, while I'm good. It's all the same. So long as they have the choice about whether to pay to get out or not, we're not a fiduciary. You think that part of Teats that talked about the penalty and the timing and that kind of stuff was just wrong? Well, I think what Teats really... It's not quite wrong. It ultimately said it wasn't enforced. I think the most important thing about that is what Teats says is... If you're right, it wouldn't have even needed to look at that. Well, I think the way I understand Teats, the way I read Teats on that issue, Your Honor, is quite frankly, I think they didn't drill down on it too hard precisely because it wasn't invoked. But I think the point is, at most, what Teats says is if it's a penalty, a true penalty, and what they didn't do is they didn't drill down to figure out whether it would be a true penalty to have an arrangement like this. And look, I'm not saying it's impossible to imagine charges that might, under some circumstances, amount to a penalty. I'm not saying that. What I'm saying is that this arrangement quite clearly is not a penalty. They have no evidence that anyone was deterred. Why isn't 5% a penalty? Well, first of all, it's not 5% of all the assets. The numbers they put in their brief are inaccurate. The numbers they put in their brief are about all assets in a plan. It's only 5% of the assets that that particular plan has in the PFIO at the time. So how much it's going to be in any given case, which is exactly why it makes sense to move it forward and to give them the opportunity to assess that, is up to them. There's evidence in the record that at least there's reason to believe in the record that at least some people were willing to pay it. And again, it's a judgment for them. The point is that they're making a judgment based on the circumstances. Do I want to pay the 12 months and get out now? Or do I want to pay 5% and get out now? Or is waiting 12 months a perfectly reasonable thing to do, especially in an investment specifically designed for the rates to move exceedingly slowly, to lag, to smooth out change? Their choice, Your Honor. Again, their choice. And there's no evidence in this record. Again, I want to emphasize this summary judgment. No evidence in this record that anyone was prevented from exercising that choice just because of a surrender charge. Thank you, Your Honors. We respectfully request that you affirm the judgment. Mr. Stris. Thank you, Your Honor. This case was dismissed on summary judgment on legal grounds. And on the question of fiduciary status, we have the plain meaning of a statutory provision. And we need to start there. That's where I started when I got up here this morning. It's a functional test. Principal agrees with that. You're not a fiduciary all or nothing. You're a fiduciary with regard to a specific act. Let's not lose sight of what the act is in this case that we're complaining about. That act is choosing the interest rate. So the answer to the question here is very simple. We look at the text of the statute. Was Principal exercising any control respecting management of the contract when it set the interest rate? Presumptively, we obviously win. Because this is not like McCaffrey or the line of cases I discussed earlier, where we were talking about a fixed or, to not use an accounting term, a set non-discretionary term. So the starting point is they're a fiduciary. The way they get out of that, or they could get out of that, is with what I keep calling a final say defense. And I can see that there is a legitimate doctrine that's developed called the plan final say defense. But we have to understand why it makes sense. It makes sense because if a plan can costlessly reject something that we are calling an exercise of discretion, it's not really an exercise of discretion. If the plan can say, we don't like your interest rate, we're out, then in fact the service provider doesn't have control. And the question here is control. What about if the participant can do that? So that's critical. I'm going to get to that. I want to just say one last thing. Because I think their plan argument is a non-starter. It's hard for me to actually even hear my colleague's argument about the 5%, because let's not forget, this is a guaranteed contract where the most you could make in any year is 1%, 2%, maybe 3% interest. It just blinks at reality that a plan would agree to pay 5% of all the assets where they could potentially make 1% or 2% or 3%. It just shows how that argument's a non-starter. OK. So we get to participants. Here's the problem with participants. So my colleague tries to make this distinction between a prudence claim and a non-prudence claim. I don't know where he's getting this from. The way this works in this circuit is, if you're a fiduciary, you not only have duties, but there's prohibited transaction provisions that say that you can't self-deal. This circuit has said that 408C applies as a defense, and you're fine if your compensation is reasonable. So the whole issue in this case to go to trial is whether or not the compensation is reasonable. That's no different than a prudence-type analysis. Look at the appendix, page 225 to 477. Hundreds of pages of depositions and evidence. As I understand the argument, it's the participants can get out at any time, so there's no discretion on their part. Right, but the problem is the subject is wrong. That's why I started by saying what we're challenging is the setting of the interest rate. Participants can't choose what the interest rate will be for this product in the plan. That's what we're claiming is unacceptable. That's a straw man. I realize my time is up, but my final sentence is, if their argument were right, the logical extension of it is that 404C of ERISA, which makes clear that even if participants make choices, the people who are otherwise fiduciaries only can take advantage of the safe harbour if they meet the requirements, that wouldn't need to exist because you wouldn't be a fiduciary in the first place. No court has ever adopted this participant final say argument, and I would urge this court not to be the first. Thank you very much. Thank you, Mr. Stris. Thank you also, Mr. Hockman.